UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| TEAIRA SHORTER,<br><br>         Plaintiff,<br><br>  v.<br><br>THE CITY OF LAS VEGAS, et al.,<br><br>         Defendants. | Case No. 2:16-cv-00971-KJD-CWH<br><br>**ORDER** |

Before the Court is Defendants Ifeanyi Madu, RN's and Joe Halpin, RN's supplement (#82) to their original motion for summary judgment (#74). On September 28, 2018, this Court entered partial summary judgment on two of Shorter's three claims (#80). That order reserved judgment on Shorter's § 1983 claim for inadequate medical treatment under the Fourteenth Amendment and granted Nurses Madu and Halpin leave to supplement their motion for summary judgment applying the Ninth Circuit's holding in Gordon v. Cnty. of Orange, which changed the legal standard for Shorter's claim. See 888 F.3d 1118 (9th Cir. 2018). Shorter has since filed her opposition (#85), and the Court now turns to the merits of Nurses Madu and Halpin's motion for summary judgment. Because this order is limited to Nurses Madu and Halpin's motion for summary judgment, the Court tailors its review and analysis to those defendants.

**I. Background**

On May 5, 2014, Shorter self-surrendered to authorities on two outstanding warrants. Police took Shorter into custody and booked her at the Las Vegas Detention Center. As part of the booking procedures, Shorter underwent a medical screening administered by Correct Care Solutions, a private entity that contracts with the City of Las Vegas to provide medical services to detainees. Correct Care employs both Nurse Madu and Halpin. Shorter's screening did not reveal any emergent medical conditions, nor did she alert Correct Care to any such issue. After

the screening, Correct Care cleared Shorter to enter the general detention population. On May 7, Shorter fell ill. She notified Nurse Madu that she was nauseated and had vomited three times in the preceding hour. Nurse Madu prescribed one dose of anti-nausea medication. Later that day, Nurse Halpin examined Shorter. During that examination, Shorter claims that she complained of abdominal pain in addition to the nausea and vomiting. It is unclear whether Nurse Halpin examined Shorter's abdomen. He did, however, prescribe a thirty-six-hour liquids-only diet and cleared Shorter to remain in general population. Shorter's condition worsened while on the liquid diet, and it is unclear whether nurses examined her at all between May 8 and May 10.

Nurses next examined Shorter on the afternoon of May 11. They found that Shorter's condition had deteriorated despite her liquid diet. Shorter was still experiencing frequent nausea, vomiting, diarrhea, and abdominal pain. Nurses also discovered that Shorter's inability to retain fluids had caused dehydration. A note in Shorter's file from May 11 stated that if her condition did not improve, she would need offsite intravenous (IV) rehydration. However, nurses did not transfer Shorter to the medical unit, nor did they order IV rehydration. Instead, the nurses kept Shorter in general population and prescribed Zofran to treat her persistent nausea and vomiting. On May 13, Nurse Halpin noted that Shorter was dehydrated and recommended she take Meclizine for nausea and drink water to rehydrate. Despite the note in Shorter's file and Halpin's finding that Shorter was dehydrated as early as May 11, Halpin did not order IV rehydration or transfer her to medical isolation. He again cleared Shorter to remain in general population. Later that day, Shorter's cellmates notified officials that she was still ill and had been vomiting for days. When the nurses arrived to examine Shorter, she again told them that she was in pain, that she was dehydrated, and pleaded to be taken to the hospital. Officials refused.

On May 14, nurses finally transferred Shorter out of general population and into medical isolation. While in isolation, Shorter again complained of abdominal pain. She described it as "squeezing pain" in her side. It is disputed whether Shorter felt the pain in her right or left side. Nurse Halpin then examined Shorter's abdomen for signs of appendicitis but did not find sufficient tenderness in Shorter's abdomen. Regardless, about four hours later, Nurse Halpin ordered Shorter transferred to University Medical Center (UMC). There, doctors quickly

discovered that Shorter was experiencing appendicitis. Worse, they discovered that Shorter's appendix had ruptured spreading infection throughout her abdomen. Due to the infection, doctors opted to delay removal of Shorter's appendix until they could treat her with antibiotics. In addition, Shorter suffered an acute kidney injury, small bowel obstruction, and other appendicitis-related concerns that required additional treatment. Shorter then brought this action against Correct Care, Nurses Madu and Halpin, and various city officials claiming that she received constitutionally inadequate healthcare in violation of the Fourteenth Amendment. Nurses Madu and Halpin now move for summary judgment.

## II.     **Legal Standard**

Summary judgment works to isolate and dispose of factually unsupported claims or defenses. Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986). It is only available where the moving party demonstrates the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(a); Celotex, 477 U.S. at 322. Once the moving party makes such a showing, the burden shifts to the nonmoving party to produce specific evidence that demonstrates a genuine factual dispute for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). A genuine issue of fact exists where the evidence "is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court makes all justifiable inferences in favor of the nonmoving party. Id. at 255. Yet, the moving party need only defeat one element of the claim or defense to prevail because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 322.

## III.    **Analysis**

The Fourteenth Amendment guarantees pretrial detainees constitutionally adequate healthcare during their detention. Conn v. City of Reno, 591 F.3d 1081, 1094 (9th Cir. 2010), cert. granted, judgment vacated sub nom. City of Reno v. Conn, 563 U.S. 915 (2011), opinion reinstated, 658 F.3d 897 (9th Cir. 2011). An official's deliberate indifference to a detainee's serious medical needs violates the Fourteenth Amendment. Farmer v. Brennen, 511 U.S. 825, 828 (1994). A serious medical need exists where failure to provide medical treatment "could

result in further significant injury or the unnecessary and wanton infliction of pain." Conn, 591 F.3d at 1095.

The Supreme Court has treated medical-care claims like other conditions-of-confinement claims, such as failure-to-protect claims. Gordon, 888 F.3d at 1124. Indeed, "the medical care a prisoner receives is just as much a condition of his 'confinement' as . . . the protection he is afforded against other inmates." Wilson v. Seiter, 501 U.S. 294, 303 (1991). Until recently, however, the tests for these claims differed in one important way: medical care claims required the detainee to demonstrate the officials' *subjective* awareness of their medical risk. Conn, 572 F.3d at 1056 (emphasis added). Other conditions-of-confinement claims required *objective* awareness of risk. See Kingsley v. Hendricks, 135 S.Ct. 2466, 2472–73 (2015) (emphasis added).

Last year, the Ninth Circuit retooled the test for claims of deliberate indifference against individual defendants to a pretrial detainee's medical needs. Gordon, 888 F.3d 1118. Gordon standardized the test for medical-care claims by dropping Conn's subjective awareness requirement and imported a purely objective standard from other conditions-of-confinement claims. Id. at 1124–25. Now, to demonstrate deliberate indifference to a detainee's serious medical needs, a plaintiff must satisfy the following four elements: (1) each individual defendant made an intentional decision related to the conditions of the plaintiff's confinement; (2) those conditions put the plaintiff at risk of suffering serious harm; (3) the defendant failed to take reasonable steps to abate the risk even though a reasonable official in those circumstances would have understood the high degree of risk involved, making the consequences of their actions obvious; and (4) by failing to take those actions, the defendant caused the plaintiff's injury. Id.

The Gordon standard represents a wholly objective test against which the Court measures the defendant's behavior. Gordon, however, did not scuttle the entire deliberate indifference framework. A showing of deliberate indifference still requires more than mere negligence. Id. at 1125 (citing Daniels v. Williams, 474 U.S. 327, 330–31 (1986)). The mere lack of due care is insufficient to prove a Fourteenth Amendment violation. Id. Accordingly, Shorter's claim fails if Nurses Madu and Halpin met the objective standard of care in their treatment of Shorter. This

objective analysis will necessarily "turn on the facts and circumstances of each particular case." Id. (internal quotations omitted).

### A. The Nurses' Decision to Assign Shorter to the General Detention Population Was an Intentional Decision Related to the Conditions of Her Confinement

The first Gordon factor presents a threshold question: did these defendants make an intentional decision related to the conditions of the plaintiff's confinement? 888 F.3d at 1125. Shorter's claim fails if she cannot show that Nurses Madu and Halpin made the intentional decision to keep her in general population. The parties agree that Nurses Halpin and Madu, indeed, made an intentional decision to assign Shorter to the general prison population. Shorter's classification as a general-population detainee directly affected her conditions of confinement. That designation dictated where she would live, sleep, and eat. Further, Shorter's general-population designation at least indirectly affected the frequency and continuity of Shorter's care. While in the general population, Shorter's care was dependent upon the nurses' schedules and the competing needs of other general-population detainees. Both nurses cleared Shorter to remain in the general population at various times during her detention. Accordingly, Shorter has demonstrated that Nurses Madu and Halpin made an intentional decision related to the conditions of her confinement.

### B. There is a Question of Fact Whether Leaving Shorter in General Population Delayed Her Diagnosis and Placed Her at Risk of Suffering a Ruptured Appendix

Next, Gordon asks whether the defendants' intentional decision concerning the plaintiff's conditions of confinement put the plaintiff at a substantial risk of suffering serious harm. Id. Stated slightly differently, did Nurses Madu and Halpin's decision to keep Shorter in the general population instead of transferring her offsite for further medical care or transferring her to medical isolation place her at a substantial risk of suffering serious harm? The nurses contend that Shorter's general-population designation did not adversely affect her care whatsoever. During Shorter's nine days in general population, nurses examined her ten times. Nurses Madu and Halpin each examined Shorter twice. And more, each time Shorter requested medical attention, a nurse responded within five minutes. The frequency of Shorter's care, they argue, demonstrates as a matter of law that her care was adequate.

Shorter counters that quantity of care does not equal quality of care. Regardless of the number of times nurses encountered Shorter, she claims their failure to transfer her out of general population put her at serious risk of harm. The nurses' delay, she argues allowed her acute appendicitis to progress to total rupture, which constitutes serious medical harm. The Court agrees that a ruptured appendix constitutes serious medical harm. While acute appendicitis is a common abdominal condition, it generally does not devolve to total rupture. See Dkt. 78, Exh. 4-1, at 7 (Fisher Report). Rupture is preventable with early diagnosis and surgery to remove the infected appendix. Id. In fact, delayed treatment is the primary reason acute appendicitis devolves into total rupture. See id. When left untreated, the rupture releases bacteria into the patient's abdomen causing a laundry list of other medical problems, including: potential infection of internal organs, sepsis, bowel obstruction, and even death. Id. (the mortality risk of appendicitis is "considerably higher" for cases of ruptured appendix).

A reasonable jury could conclude that the nurses' decision to leave Shorter in general population delayed her diagnosis and allowed her appendix to rupture. Shorter complained of nausea, vomiting, diarrhea, and abdominal pain throughout her detention. Each of her complaints alerted nurses to the symptoms of appendicitis. Fisher Report, at 7. However, during Shorter's entire detention in general population, no one examined her abdomen to determine whether she was suffering from appendicitis. In fact, it was not until nurses transferred Shorter to medical isolation that they first checked her abdomen for appendicitis. Accordingly, Shorter has demonstrated a question of fact whether Nurses Madu and Halpin's refusal to transfer her from general population to receive more in-depth treatment placed her at a substantial risk of serious harm.

### C. **An Objectively Reasonable Nurse Could Understand Shorter Was at Risk of Suffering a Ruptured Appendix and Nurses Madu and Halpin Failed to Examine Her Abdomen at the Onset of Her Symptoms, Which Could Have Abated that Risk**

Gordon next explores whether, despite placing the plaintiff at risk to suffer serious harm, the "defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious." 888 F.3d at 1125.

Here, that boils down to two questions. First, would a reasonable nurse understand the high degree of risk associated with allowing a detainee suffering from symptoms of appendicitis to remain in general population? And if so, did these nurses take reasonable and available steps to abate that risk? This element is a completely objective. The Court looks only to the whether the nurses' conduct was "objectively unreasonable" given the "facts and circumstances of [this] case." Id.

Shorter has presented a genuine issue of fact whether a reasonable nurse would understand her risk of appendicitis, sepsis, and possibly death. She has also provided evidence that these nurses could have abated her risk by transferring her to receive specialized care when her condition did not improve over the course of her detention. They could also have abated Shorter's risk by at least examining her abdomen for appendicitis while she was housed in the general population.

A jury could find that a reasonable nurse would understand Shorter's risk of suffering a ruptured appendix based her various complaints throughout her detention. From the beginning, Shorter made her condition clear to her attending nurses. On May 7, Shorter first complained to Nurse Madu of nausea and vomiting. Dkt. 85, at 2. Later that day, Shorter complained to Nurse Halpin that she was still nauseated and was experiencing abdominal pain. Id. at 3. Nurse Halpin placed Shorter on a liquid diet, and nurses did not examine her again until the afternoon of May 11. Id. On May 11, Shorter renewed her complaints of nausea and vomiting. She also complained that none of the treatment she had received had alleviated her symptoms. A note in Shorter's chart from that exam acknowledged her deteriorating condition. It stated: "Patient is still nauseated with vomiting." The note further specified that if Shorter's vomiting persisted that she should be transferred offsite for IV rehydration. Id. at 4. On May 13, nurses again examined Shorter who complained that she was nauseated, diarrheal, and vomiting. Later that night, Shorter pleaded with nurses to be transported to the hospital because her condition had not improved. Id. She again complained of stomach pain and vomiting. Id. On May 14—nearly a full week after exhibiting symptoms of appendicitis—Shorter was finally transferred to medical isolation where she complained of "squeezing pain" in her abdomen and continued nausea and

vomiting. Id.

An objectively reasonable nurse would at least understand that Shorter's consistent nausea, diarrhea, and intractable vomiting placed her at risk of becoming dangerously dehydrated. Dr. Fisher opined that in situations like Shorter's—where a patient cannot retain food and fluids due to persistent vomiting—the patient risks suffering dehydration. Fisher Report, at 6–7. She also reported that in prolonged cases of intractable vomiting, oral hydration is not effective. Id. at 7. In these cases, IV rehydration is necessary. Shorter's medical chart noted the potential need for IV rehydration as early as May 11. Given Shorter's deteriorating condition and the note in her chart, a reasonable nurse would understand her risk of suffering dangerous dehydration. Additionally, a reasonable nurse may have recognized that Shorter's complaints of nausea, vomiting, and pain in her abdomen were symptomatic of acute appendicitis. According to Dr. Fisher, the common symptoms of appendicitis include: abdominal pain, loss of appetite, nausea, vomiting, and diarrhea. See id. As early as May 7, Shorter had complained of nearly each of those common symptoms. However, the nurses did not explore whether she was suffering from acute appendicitis. Based on Shorter's complaints throughout her detention, a jury could find that a reasonable nurse would understand that Shorter was at risk of suffering dehydration and acute appendicitis.

Because Shorter presented evidence that a reasonable nurse would understand her risk of harm, she now must demonstrate that Nurses Madu and Halpin failed to take some available and reasonable action to abate that risk. Gordon, 888 F.3d at 1125. Shorter argues that nurses were aware that Shorter was suffering the symptoms of appendicitis as early as May 7 but did not examine her abdomen or transfer her to medical isolation for a week. Both actions—transfer and abdominal exam—were available to the nurses. And both would be reasonable given Shorter's symptoms. See Fisher Report, at 7–8. Diagnosing appendicitis is a routine procedure. Dkt. 78-6, at 32 ¶ 11–20 (Tsuda Testimony). A nurse or doctor looks for three things when diagnosing appendicitis: that the patient has not previously had their appendix removed, that the patient is experiencing pain in the right-lower quadrant of the abdomen, and that the doctor finds tenderness in the right-lower quadrant of the abdomen. Id. at 32 ¶ 15–20. If those three things are

present, appendicitis may be diagnosed with 85% accuracy. Id. However, nurses did not examine Shorter's abdomen until May 14, which may have been after her appendix had ruptured.

In sum, a reasonable nurse would understand Shorter's risk of suffering a ruptured appendix and these nurses did not take the reasonable and available measures to abate Shorter's risk of harm. Both nurses could have abated Shorter's risk of suffering a ruptured appendix by examining her abdomen near the onset of her symptoms. Instead, they let Shorter go without care for days at a time. During that time her risk of harm only increased. Therefore, Shorter has satisfied the third Gordon element.

### D. There Is an Issue of Fact Whether the Nurses' Failure to Timely Diagnose Shorter's Appendicitis Caused her Serious Harm

Last, Shorter must demonstrate that the nurses' failure to take available actions to abate her risk caused her injury. Gordon, 888 F.3d at 1125. She argues that the nurses' decision to keep her in general population allowed her acute appendicitis to progress to full-blown rupture. The rupture caused her unnecessary pain, prolonged her hospital stay, [1] and increased her medical expenses. Shorter's UMC physician, Dr. Tsuda, agreed that the nurses' delay allowed Shorter's appendix to rupture. He testified that Shorter was in the latter stages of appendicitis when she arrived at UMC and that Shorter should have been transferred to the hospital at least three days earlier. See Tsuda Testimony, at 20. Shorter's medical expert opined that officials should have transferred Shorter even earlier—thirty-six hours after she first exhibited symptoms on May 7. See Fisher Report, at 7. Both doctors agree that the delay in Shorter's diagnosis and transfer allowed her appendix to burst, which spread bacterial infection throughout Shorter's abdomen. The infection was so serious that Dr. Tsuda could not immediately operate; it would have been too dangerous to remove the ruptured appendix without first administering antibiotics. Tsuda Testimony, at 18 ¶ 13–25. Overall, the nurses' delay exacerbated Shorter's injury and caused her harm. This substantially lengthened Shorter's hospital stay, caused prolonged pain, and increased her medical expenses. Accordingly, a reasonable jury could conclude that the nurses' delay in transferring Shorter to the hospital caused her injuries.

---

[1] Generally, an appendectomy is a common and routine procedure that requires a day-long hospital stay and outpatient recovery. As detailed above, Shorter's case was more complex and required a much longer hospital stay.

**IV. Conclusion**

It is **HEREBY ORDERED** that Nurses Madu and Halpin's Motion for Summary Judgment on Shorter's § 1983 claim set out in their Supplemental Briefing (#82) is **DENIED**.

Dated this 17th day of January, 2019.

_____
Kent J. Dawson
United States District Judge